Green, J.
On the 13th day of March 1783, a certificate of pre-emption was granted by the commissioners to the heirs of William Craig, in the following *249 words: “State of North Carolina, No. 376, commissioner’s office French Lick, 13th March 1783. Heirs of William Craig obtained a pre-emption of 640 acres of land, lying on the waters of Harpeth river, adjoining on the west, north west of the lands claimed by Maj. Absalom Tatum, running west and north for quantity.” On the 22d day of April 1784, James Craig, heir of William Craig, made the following entry: “No. 415, the heirs of William Craig enter a pre-emption of 640 acres of land, lying on the waters of Harpeth river, adjoining on the west and north west, the land claimed by Major Absalom Tatum, running west and north for quantity.” Upon this entry a grant issued 25th February 1812.
The entry of Tatum called for in Craig’s entry, was made the 6th February 1784, and calls for, “lying on the south side of Big Harpeth river, on a fork, called Daniel’s fork, it being the second creek to the westward from where the said commissioners began the line, near the glades of Harpeth, about eight or ten miles west from the said beginning, which said line is the southern boundary of Davidson county; beginning west of the ten mile tree, extending north and south and east for quantity.”
It is in proof, that Tatum, one of the commissioners for running the military boundary line, after running west from the beginning, and at a short distance crossing Harpeth river, and passing over some high ridges, came to a creek that appeared to be one of the branches of Harpeth, on both sides of which was a large body of good land, extending both sides of the line they were then running; that when Tatum got to the ten mile tree, he looked back, and publicly spoke out, and notified the whole company, that he would lay his service right of 5000 acres on that place, running back east so as to cover that body of good land, over which they had just passed, and that this place afterwards became notorious as Major Tatum’s claim. Defendant’s entry *250 1S dated 7th February 1784, and calls for joining Major Tatum’s entry, beginning on bis north west corner.— This entry is for 1888 acres, and is founded on a military warrant. On the 14th of March 1786, Polk’s said entry was granted. Polk by his tenants, has been in possession of the disputed land under his grant, ever since the issuance of Craig’s grant. It is agreed, that the entry and grant of Craig, and of Polk, cover the land in dispute. James Craig, heir of William Craig, and father of the present complainant, has been lunatic with lucid intervals from the year 1794, until his death in 1817.
Upon this statement of the case, the first question for consideration is, as to the effect of the pre-emption certificate, and the character of right it communicates to the holder.
By the act of 1782, ch. 3, sec. 7, the legislature declare, that it being represented to that body, that sundry families, before the passage of the act of 1780, had settled on the tract of country, reserved in said act, to be appropriated as military bounties, “that .640 acres of land shall be granted to each family, or head of a family, and to every single man of the age of twenty one years and upwards, (to include their improvements,) settled on said land before the first day of June, one thousand seven hundred and eighty, for which they shall have the right of pre-emption.”
By the twelfth section of the same act, the commissioners (Tatum, Bledsoe and Shelby) are empowered to grant certificates of pre-emption to those persons who shall appear to them to be entitled; and to note down in a book, to be kept by them for that purpose, the names of such persons, to whom certificates of pre-emption shall be granted, a copy of which certificates they shall return to the general assembly.
The general assembly of North Carolina intended *251 by these provisions, that while they were providing for, and rewarding their officers and soldiers for their meritorious services, rendered during the war, that no injustice and hardship should result to the hardy adventurer, who in despite of all the difficulties and dangers he had to encounter, had made his way to the west, and had actually settled with his family on these lands. But it was in favor of such a case of merits, and to prevent such a hardship as would have existed in driving them off, that the provision is introduced. To be entitled to a certificate, the party applying must show that he had an improvement; that he was settled on the lands; that he had been there before the first day of June 1780; and the certificate when granted must include his improvement. These facts being established before the commissioners, authorize them to grant a certificate, and entitle the individual to whom granted, to a pre-emption. For the purpose of enabling the commissioners to ascertain the facts necessary to be shown, they are authorized to administer oaths. Inasmuch as the act did not intend to grant a pre-emption to any but those who had an improvement, and were settled on it, and whose claim included it, so it did intend, that they should be protected from disturbance, and should have a preference of entry to all the world. I do not conceive that the book in which the names of pre-emptioners were to be registered, nor the copies of the certificates to be returned to the legislature, were intended to operate as notice to holders of military warrants. The notice contemplated, was that to be furnished by the actual residence of the pre-emptioner on his improvement; which residence the law had said, should give him the right to enter. The certificate was the evidence to the entry-taker of his right to make the entry. For by the act of 1783, ch. 3, sec. 8, none but military claimants and pre-emptioners had a right to make entries in the military boundary for three years. No record was neces *252 Sary to be ¿ept of the pre-emption certificates by which ^0 give notice. That would only have been constructive notice; but the actual residence on his improvement, would furnish all persons with actual notice that they had no right to appropriate that spot. I do not conceive that the certificate of pre-emption is the inception of title. It promised protection against others, and confers the right to obtain a title by making an entry and paying for the lands at the rate afterwards prescribed. It gave the pre-emptioner an exclusive right to obtain a title for that spot of ground; consequently no person else had a right to make an entry there, and if such entry be made, it is illegal, and as against the pre-emptioner, confers no title.
A question arises here, whether the whole of a preemption certificate, which does not include in its calls his improvement, was entitled to a preference of entry. I am of opinion that no such right, in that case, would exist. Although the commissioners were empowered to hear evidence and determine upon the existence, or non-existence of the facts necessary to entitle a party to a pre-emption, yet their determinations are not conclusive upon the courts. The facts upon which the law predicates the right of pre-emption are enquirable into, and may be shown not to have existed, and if shown not to have existed, the right would be destroyed. But the decision of the commissioners must be taken prima facie, in favor of the person holding the certificate, until the contrary is shown by the adverse party. In this case, there is no evidence to oppose the presumption furnished by the certificate, that William Craig, the pre-emptioner under whom complainant claims, was settled upon the land described in the certificate. The next question therefore is, whether the description is such as to lead to the legal conclusion, that the calls of the certificate include the same land afterwards entered and granted in the name of the heirs of Wm. Craig. It is conceded at the *253 bar, that inasmuch as an elder entry, which seeks to overreach an elder grant, and by connecting itself with a younger grant, give the better title, must be special, and cover the same land with the grant with which it is connected; so here the certificate, to come in aid of Craig’s title, and overreach Polk’s entry, must be shown to be special, and to cover the same land with Craig’s entry and grant. The only calls in the certificate defining where the land lies, are “lying on the waters of Harpeth river, adjoining on the west, north west of the lands claimed by Major Absalom Tatum.” Tatum’s entry was made long after the date of the certificate. But it is said he had a claim at the same place where his entry was afterwards made, previous to the date of the certificate, and that this place was notorious as his claim. If a certain identified spot had become notorious by the name of Tatum’s claim, a call to adjoin it would be good; but a general knowledge, that Tatum had a claim somewhere in the neighborhood, would not be giving sufficient locality to it, to authorize a man to call to adjoin it. Cooke’s Rep. 356.
The evidence is, that when Tatum got to the ten mile tree, he stopped, looked back, and pointing to the good land over which they had passed, said he intended to lay his service right of 5000 acres there. Taking this for the description of Tatum’s claim, it is not the description of a particular spot, which may be identified; and however notorious it may have become, it would only be a notoriety that he had a claim some where in the neighborhood, which has not sufficient locality to it, to authorize a man to call to adjoin it.
It is urged, that an entry calling to include a particular object, maybe surveyed in several different ways, and so that the object be included in the survey, it will be good; that a call to adjoin such entry before the survey is made, would be good; but that such entry, before surveyed, could be no more identified than *254 Tatum’s claim; therefore, that the call for Tatum’s claim is good.
The reason why a call for a prior entry, which itself is special, is holden to be 'good, is founded upon the legal presumption, that the lines of an entry, when surveyed and marked, are precisely the same as designated in the entry. The lines being the same, the survey only gives visible signs indicating a line which had a legal existence, in precisely the same place before. The call, therefore, to adjoin a special entry, is as good as a call to adjoin a survey. The line being surveyed, is held to have a potential existence from the date of the entry; but this reasoning cannot apply to Tatum’s claim. It was a claim unknown to the law,; therefore the law could not affix to it boundary, or connect it with a subsequently ascertained boundary of Tatum’s legal claim, so'as to give such boundary relation back to Tatum’s claim, as known to the law.
I conceive, therefore, the call for Tatum’s claim to be vague, and. for that reason cannot be connected with the entry and grant of Craig, so as to overreach Polk’s entry.
Catron, Ch. J.
The pre-emption certificate will, in this case, be placed on the foot of an entry, and be deemed an appropriation of the land. As an entry to postpone a younger entry, Craig’s pre-emption certificate must on its face be special for the land claimed: personal notice where the land claimed lies, will not be sufficient, because the paper, if placed in the hands of a surveyor, must have on its face such a description of mountains, creeks, or other natural or artificial objects, that by reasonable industry and inquiry he can find the land. Has Craig’s certificate the requisite specialty to fix it to a certain spot, that from its face could be found? 1. It is to lie on the waters of Harpeth river. 2. Adjoining on the west, and north west, the lands *255 claimed by Mai. Absalom Tatum. The entry is vacue, save by reference to Tatum’s claim. The pre-emption certificate bears date the 13th March, 1783. At this time, Tatum had no entry for, or legal claim to any land on the waters of Harpeth; but he was entitled to 5000 acres for his services, as commissioner for running the continentinal line, &c. Whilst running the line, and before March, 1783, he declared he intended to take his land in the neighborhood where Craig’after-wards entered his pre-emption right. This declaration, from the time it was made, was notorious in the country; and it was also notorious, that Tatum claimed the right to enter the 5000 acres on that body of rich land, which was known by the name of the land claimed by Maj. A. Tatum. The bill alleges Major Tatum’s 5000 acres was located and marked out, and notoriously claimed and known as his claim,, before March, 1783; and that in reference to this claim, fixed by marked boundaries, was the certificate of preemption made. Did the proof sustain the allegations, I think the complainant would be entitled to a decree. If so, a surveyor could have found it, and the entry would have been special within the authorities. 1 Ten. Rep. 486, 507. Cooke’s Rep. 152. General notoriety that Maj. Tatum claimed to enter the land in that neighborhood, is not sufficient; such claim gave no identity to any fixed boundary; where his north west corner was, no surveyor could possibly ascertain. Maj. Tatum made not a mark, but only notified the. company he intended to locate his 5000 acres in that large body of good land, by waving his hand towards it. This left the boundary wholly uncertain. At the time therefore, the pre-emption certificate was made, it was not fixed by calling for Tatum’s claim, to any particular spot of land, and was vague.
On the 6th day of July, 1784, Tatum entered his 5000 acres on part of the large body of good land, *256 where he gave notice he would locate it. On the next day, 7th July, 1784, Polk made his entry on Ta-turn’s north west corner. On the 22d April, 1784, Craig entered Ms pre-emption in the words of the pre-emption certificate, joining on the west and north west Maj. A. Tatum. All these entries are special. It is contended, and with great ingenuity, that so soon as Tatum made his entry, (6th February, 1784,) it gave specialty to the pre-emption certificate at the north west corner of the entry of record, made by Tatum, of which Polk was obliged to take notice, and by which he was bound. This argument is clearly unsound. No such presumption could arise from the face of the record evidence. Craig tells us, in his certificate of pre-emption, on the 13th of March, 1783, that he joined on the north west, the lands claimed by Maj. A. Tatum. Now what evidence does Tatum’s entry of February, 1784, furnish that it covers the sainé land claimed by him in March, 17831 It is an entry for vacant land not previpusly .claimed by any one, for any thing appearing from the face of the entry. The argument results in this unsound position, that had the certificate been granted to lie at the north west corner of Maj. Tatum’s commissioner’s claim for 5000 acres, it would have been special and valid, so soon as Maj. Tatum’s entry should be made, if it was even made special, when'made. No such certificate entry, depending on the will of another, was ever contemplated by the laws of North Carolina. Craig’s certificate must stand or fall, so far as identity or location to a certain spot, is necessary to its validity by the objects, be they natural objects or artificial marks, that existed or were referred to when it was made. As to the notoriety of the objects, the rule is otherwise. They may not have been notorious when the entry was made, but became so before the conflicting entry *257 had existed, and at this time afford the subsequent en-terer notice oí their position.
I think the chancellor did not err when he dismissed the bill.
Bill dismissed.